Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 162107, Alfonso Cialino v. George Gikas. Good morning. Good morning members of the panel. My name is Stephen Pfaff. I represent George Gikas. I would request very respectfully two minutes of rebuttal after my brother was finished. You may have it. Thank you, Your Honor. I'd also like to bring to this Court's attention a case that's just been published as of last week. It's germane to the case before you. The name of it is Murphy v. Palmer. It is from the District Court of New Jersey. The Lexus site is 2017, U.S. District Lexus, 83117. That's fine. But send us a 28-J letter after the argument with that citation. I will, Your Honor. Thank you very much. The question before the Court really is a qualified immunity question with respect to excessive force. And the question really, I think, comes down to this. Would a reasonable officer, based on the facts before him, have taken the plaintiff to the ground in the manner that Defendant Gikas did? Simply, that's simply it. I could tell you from the factors presented to Gikas at the time of this event that I believe it was objectively reasonable for a police officer to do a takedown in the manner that he did it. Number one? I've watched the videotape, and I must say that grabbing someone around the neck or by the collar and pulling them backwards and down seemed to be a bit more force, at least, than was necessary under the circumstances. And the jury did find that excessive force was used. It did, Your Honor. So I think you'd better talk about some of the details as to why it was reasonable for him to use that degree of force. Certainly, Your Honor. Let me describe to you what existed by way of facts prior to the jury confirming some of those facts. Number one, the plaintiff had been drinking. Number two, the crowd had been drinking. Number three, the crowd was growing, ever growing at the moment. In addition to the people who were coming from one end of the festival to the other end of town, you had the emptying of the St. Peter's Club immediately in that vicinity. This created an unrefuted crowd of about 200 to 250 people. Now, the purpose of the presentation of the law enforcement people that evening at that very moment was to keep the crowd moving and flowing. Due to the actions of Mr. Cialino, however, that crowd began to slow down and become more stationary and effectively becoming more volatile than it had been prior to Mr. Cialino's actions. Well, what's the evidence they became more volatile? The fact that they became stationary and the fact that Mr. Cialino was appealing to them. Remember that it's unrefuted that he said the dogs can't bite us, they're muzzled. The us that they're referring to are the members of the crowd. So an uncontroverted fact is that he was saying that and exciting the crowd. And at that point, it became incumbent on the officers to keep him moving and away from that. But he kept circling. You only see in the video a small snippet of what happened. You see one event in which Mr. Cialino comes and points at the dogs. But that's the third or fourth time that he did that. But you seem to be making arguments about why force could be used. But I think the question is why does the amount of force that was used not constitute excessive force? And you don't seem to be speaking. I don't think the crowd and all that can get to the question of whether pulling somebody whose back is turned to you by the collar such that they're going to fall backwards is an appropriate way to have handled the need to restrain him. I understand Your Honor's question. Just first, I think you're assuming that, in fact, he fell backwards. He did not. He was spun around like this and fell forward down in a controlled takedown. The reason why this is necessary is because the plaintiff could not be allowed for a fourth time to go back into the crowd and circulate and incite the crowd to a degree that would have caused some sort of danger to the crowd or to the police officers. The jury found that the plaintiff had disobeyed orders. You're still focused with respect on the question of whether force could be used. There's no question. There's no dispute in that. Right. There's no question force could be used. So why could the force have been used that was used? That's what I'm not understanding. You don't seem to be addressing that point. Because of the necessity to remove a bad apple from a bushel so that the rest of the apples would not be contaminated. Take as the alternative a tap on the shoulder. Sorry, you're under arrest for having taunted the dog, even though the officer whose dog it was doesn't seem bothered by it. I don't think that was a possibility at the time, Your Honor. Then why is that? Because the plaintiff had refused orders to move on, numerous orders to move on, as the jury found. So at that point in time, Officer Dekus realizes that anything he says to him, his presence is not going to work and his verbal commands are not going to work. So now he has to put hands on him. The jury found he had probable cause to arrest. I'm sorry, I don't think that's a satisfactory answer. The officer standing next to him, whose dog had in fact been the dog commented on, doesn't appear to be perturbed in any sense. He does not take an action to arrest the defendant. It's another reasonable officer standing there who thinks not only is the degree of force not necessary, but no force is necessary. But there's no indication on the video as to whether or not that officer, Officer Pickles, was actually focused on the plaintiff. There's 200 other people in the crowd. I suggest to you it's very reasonable for him to be looking at other parts of the crowd. This dog has just, on your version of it, been harassed and he's not paying attention to this guy? Oh, I think he sees the dog being harassed and pointed by Mr. Cialino. In fact, after the point, that's when Pickles turns and looks directly at Mr. Cialino and takes a step in the video, only to look to his right again and see Officer Dekus coming in to grab Mr. Cialino. Your question is, really, he pulled him from behind. Why not a tap on the shoulder? I suggest to you because orders had already been given for him to move and he was disobeyed. That was true in the Raich case. The motorcyclist had refused to stop in order to do so on the first occasion. But the Raich case involved pulling the individual off the motorcycle for not wearing a motorcycle and then picking him up and dumping him on his head on a concrete sidewalk. At this point in time, this was a controlled takedown. Is there evidence that was presented to the jury that's in the record regarding what standard operating procedure is for taking someone down from behind? Not directly like that, but it's a very good question. I think the elephant in the room for the plaintiff is the fact that he didn't address or controvert any of the training that Dekus had received during his course as a correctional officer. His training, as he went over, is the continuum of force. You start with your mere presence, that didn't work. You start with verbal commands, that didn't work. You then have to put your hands on the individual. And his training was such unrefuted testimony. In his day two of the transcript, page 148 to 171, that's where you'll find his testimony about the continuum of force. That's going to tell me that he can put hands on. I'm asking, is there anything that was presented to the jury that this way of doing it is the right way of doing it? Not in that particular way, but removing the individual. Well, then how is that helpful to you? Because the jury, looking at it without any basis, and we have no basis for concluding it, you're just making a judgment. Does that look like the most sensible way or a plausible way of taking somebody down? Or does it seem like an excessive way? And what in the record would suggest it's not excessive? The fact that he's been ordered, Mr. Cialino, three or four times to leave the area, the fact that the crowd is going, it's an immediate reaction necessitated by Cialino's actions, and it means that individual has to be removed as quickly as possible. You can pick him up and throw him down. Okay, let's say that gets you to grabbing him by the collar or grabbing him by the arm. And seeing if he, I mean, you've got dogs there, you've got three other officers. You say it's a volatile crowd just because it's stopped. If this person then puts up any resistance, we're moving along the continuum of force to overcome that resistance. But here, I mean, the person wasn't even told he was under arrest. He was not at that point. He was removed from the scene so the scene would not get any worse than it could be. By removed, do you mean he was thrown to the ground? He was not thrown to the ground. Well, we've seen the video. To me, it looks like he's being thrown to the ground. Respectfully, I think it's— You call it controlled. I call it you're accelerating downwardly and impacting the ground on your shoulder. But that's not the definition of the word throw. The word throw is propel something with force through the air by movement of the arm. And the example is throwing a brick through the window. Mr. Cianlino was not thrown. And the judge says— How do you throw a person to the ground? You pick him up and throw him like that. You've got to lift him? I don't think you—I think you have to let go. He doesn't. I see. Geekus never lets go. He grabs him with one hand. One of my characterizers is yanking him to the ground. Would that be correct? Yeah, yanking would be it. Yes, I would say that's appropriate in the situation. And what in the record would suggest that that is appropriate other than just— And what do we have to go on? There's various ways in which one could be restrained, right? Sure. You have the other— So there's this way that we've seen on the video. And there's other ways one could conjure. And I guess I just don't know how I'm supposed to make a judgment that this just can't be excessive because it's the right way to do it when nothing in the record seems to say this is the right way to do it. But there is something in the record. Okay, what? It's Geekus' testimony with respect to training, and it's the elements that he had available to him that evening that he did not use. He didn't stick the dog on him. He didn't use pepper spray. He didn't use his baton. And he didn't use deadly force by way of his firearm. He used the next step and the continual force. I would also— I'm sorry, Your Honor? Do you realize what you just argued? I just said he had— Unless he didn't use deadly force, this force is not excessive? No, I'm not arguing that. I'm arguing that that's what he had available to him on the continuum of force. Clearly, he could not have used a firearm to subdue Mr. Chialetto. But I suggest to you he could have—the possibility of a pepper spray was there. That's the next step, and he didn't use it. Our officers routinely—and I don't think it's different from over the years. Our officers routinely taught you use as much force as is reasonably necessary to overcome the resistance and effect the arrest. Yes, they are. And here, he just escalated on that continuum right away to placing the person through the air at an accelerating speed until he hit the pavement, all under control, without any resistance to the arrest at all. Well, Your Honor, respectfully, I suggest to you that his verbal presence was not working that evening. Well, he wasn't informed he was under arrest. Well, he doesn't have to—I'm sorry, he wasn't informed—he was not informed that he was under arrest. Right, so how could he have resisted arrest? Wrap it up, counsel. Sure. You've got two minutes. He didn't resist arrest, Your Honor. He was arrested for being a disorderly person. And the next step in the continuum of force is for him to use an open-hand technique like Gikas did. It's in the record. That's how he was trained. And he placed it on top of him. Sure, it would have been better if Mr. Cialino was facing the officer as he did it. He could put his hand on him. He could see what was happening. But in a rapidly changing atmosphere, knowing that the process by which Cialino was continuing was to go circulate and go back in the crowd, it was necessary to have Gikas grab him, even though he didn't know it, and spin him around and take him down. Thank you. Thank you, Your Honor. May it please the Court. My name is Robert Sinsheimer. I represent the plaintiff in this matter. They say a picture is worth a thousand words. Yes, but we're told that this picture is only a very small fraction of the various pictures that make up this scenario. Well, it's not a small fraction of the force. It covers the force utilized in its entirety. But his justification involves a lot of scenarios prior to the video that we saw. All of which were put in by self-serving testimony of the police, who chose not to call a single civilian among the so-called 200 that were supposedly present, and chose not even to call, as Your Honor has already pointed out, the person among their own group, meaning Officer Pickles, who was by far and away the closest person to the action. Pickles saw everything. They didn't call them. We didn't call them either. We did call civilians, most of whom, frankly, had some bias. They were friendly with the plaintiff. But the facts and the like most favorable to the plaintiff are that he did next to nothing to cause anybody any harm whatsoever. Now, I'm wedding to the verdict. Do you deny that he had been told four times to move on? Yes, I deny that, and I don't think that's in the record. I think, generally speaking, the crowd was told, move on, move on. Now, I am accepting that there is a special question that he didn't follow any order. The question itself is a little bit vague, so I'm not going to ‑‑ I don't mean for my answers to suggest that I'm undercutting the verdict, because I think that what happens then is, if you've got to look at the clearly established problem of qualified immunity, you go back to the Rage case, which I do think, factually, is the closest First Circuit case, because when I use the word fact in this context, I'm also referring to procedure and posture of the case. What makes Rage a powerful precedent, I suggest, is that it comes post-verdict, and it comes with clearly a finding by the First Circuit that probable cause for some arrest had existed. And that gets back to Jurado's question. You know, maybe there was some right to put hands on it, but it doesn't get to the excess, which is what this is all about. Could you address, if I understood, he said in the record, it will show that Officer Geekes' training showed that using an open hand to affect a use of force is the training. So I guess, is that your understanding of the record? It's largely what he said. Yeah, I said, okay. And is there anything that refutes that? No. Okay, so just stick with me on this. So if the record shows that his training is that he can put an open hand on to affect an arrest or use of force, how do we evaluate what was done here, which is the person scuds back to him, so that when he puts the hand and pulls him, there's a high risk that you're going to fall back and end up on the ground? Does the record elucidate how an officer is supposed to proceed in that circumstance if they want to affect an arrest? You asked that question somewhat similarly to Mr. Faft. You know, is there any evidence about the precise way of doing it? The answer to that is clearly no. What the yes was to there is general, I argue, self-serving testimony by the officers. This is how we were trained to do it. That, to me, is a question of credibility. You know, neither side called an expert. And that was, in my case, by choice. We had a rebuttal expert ready. That may be extra record a little bit, but my brother knows that. And there was a lot of back and forth on it. Now, in that regard, I point to footnote four of the very recent stamps decision, wherein the court wrote, to be clear, we do not mean to suggest that such evidence is necessary, referring to training and the need to prove it, we do not mean to suggest that such evidence is necessary or sufficient to establish a Fourth Amendment violation or that compliance with police protocols and training necessarily renders an officer's conduct reasonable. So the fact that he says this is how I was trained to do it doesn't mean anything. And, in fact, I argued to the jury. Actually, it does mean something because in our prior case law where we found excessive force was used, like the stamps case, the fact is that the officer violated the protocols of good policing. Here he's saying, I didn't violate them. I actually followed them. And you put on no evidence of any disagreement with that. Is that correct? Well, the way you phrased the question. Yes, I know it's a tough question. No, no. That's why it's the First Circuit. I understand that. What I mean is this. I guess I have to repeat that we did not call an expert. And that was by choice. But you also say you're denying the premises that he says his training required him to follow. That first you warned someone. You say your client had been warned how many times? Well, he said four. I know he said, but what did your client say? My client said he heard, generally speaking, move along. That that was directed at the crowd. He didn't think it was directed at him personally and that he was. . . Why wasn't it directed at him personally? Why did he perceive it wasn't directed at him personally? Well, if you ask me subjectively, he didn't perceive he was doing anything wrong whatsoever. I need to reemphasize that. However, as I said, I am not going to attempt to undercut the verdict of the special questions. I argued below that they were unnecessary. But let me get back to the point that you made. Because there's other evidence from another officer, an officer Crowley, who testified, this is day two, page 24, that he was told not to yank people out of the crowd. That's a direct quote. And that was sort of the . . . Told by whom? There was sort of a meeting among law enforcement to prepare for this event. Which, by the way, just to be clear, again, my brother does a wonderful job of making it sound like this is a kind of a major crowd control problem. This is a big party. That's all we're talking about. It's a big party. Families, maybe at midnight, not so many kids anymore. Families out. . . There's no evidence of intoxication. None. There's evidence that some people had alcohol. This is a family event in a small town. Would you answer the question? The question of whether or not . . . Do you remember what the question was? I may have. Who told him? And then the next question is going to be . . . Oh, I'm sorry. I'm sorry. I . . . Did the officer in question hear that instruction? Do you have any evidence of that? I have no evidence that this officer heard the exact instruction. Was he at the meeting? I believe so, but I'm not going to say I'm 100 percent sure. But the testimony is toward this officer who was a rookie. Just grabbing people, you know, being with another at the time is kind of a guideline. And he went on to say that that was directed toward him because he was a rookie. So that may answer your question to some limited extent. But the notion that you're not supposed to be yanking people out of a crowd when it's clearly within their purview to enjoy themselves, I don't think is in any way . . . That's a question of fact. Yes and no. Because not whether that standard operating procedure is excessive or not, but just what it is. That's a question of fact. Sure, it's a question of fact. And so then is your view that given the state of the record, given the posture we're in, the ambiguity as to what a standard operating procedure is, we should read it as if the jury would conclude this was not a standard operating procedure? Absolutely. Because if you look at the excessive force instructions, they were given a very complete set of guidelines that's totally consistent with all the law, going back to Graham v. Conner and probably before that. And that includes quite a large number of factors. Among them, all of the various scenarios that could have been important in this kind of case. Remember, they were not deciding qualified immunity, which I understand, of course, is a question of law. So they made a very, very clear determination based on the totality of the record, proved by both sides that this was clearly excessive force. Did the instructions to the jury about what is excessive force include any reference to police training and protocols? Can you answer that? I don't think I can answer that as quickly. I could find the page in 30 seconds. That's okay. It's in the record. There's a list of seven or eight. I don't recall if training was one of them. Thank you, Your Honor, for your time. Thank you. Counsel, can you answer my last question about the instructions to the jury about what they are to consider in reaching a decision on whether the force was excessive? Yes, Your Honor. My recollection is, I can't refer to the page, but my recollection is that the instructions on excessive force said that the officer's training could be considered. Okay. And as the court suggested, it was unrefuted that there was nothing in opposition to what Gikas offered by way of his training. I thought there was evidence in the record just referenced that it's a guideline not to yank people out of the crowd. Well, that's from Crowley. Yeah. I believe. Crowley is a Gloucester police officer. My client is an Essex County Sheriff's Department who had different training than Officer Crowley. And there's no evidence in the record whatsoever that my client attended the meeting that Crowley attended when allegedly someone said you can't yank anybody out of the crowd. No evidence whatsoever on that point. But wouldn't that still tell us something about what general practice was among police officers? I could tell you this, Your Honor. There is no training with respect to Gikas on the issue of an individual being disorderly in which you can or cannot yank him in the manner that Gikas did. That's absolutely clear. It all depends on the situation. So there's no training on the specific point that either side can point to? There is no training on that. And you wouldn't find that anywhere for any law enforcement. Well, doesn't that mean, then, that the jury could have concluded that the training didn't support the action? Because you have to assume the record in light was favorable to the verdict. Sure. So if they were instructed you can take account of training, and there's nothing in the evidence that says the training suggests this was appropriate or inappropriate. Don't we have to assume the jury must have concluded training did not support this action? You can assume that, but for the issue of qualified immunity, it doesn't make any difference that the jury found that there was excessive force. There can be a finding of excessive force, just like Judge Lynch did in her dissenting opinion in Jennings. There can be a finding of excessive force, but you can still have qualified immunity. But it can't be subjective. It's never subjective. It's a reasonableness standard. And a reasonable police officer faced with this situation has never been trained to yank somebody out. It's to remove the individual from the situation so as not to create a volatile atmosphere. Did anyone from the defense cite any precedent? I don't mean legal precedent. I mean training or experience or prior, like a, you know, and say, this is how we do it. If we don't tell them they're under arrest, the very first thing we do is we grab them from behind and then we get them down to the ground. No, Your Honor. The training is such that to remove the individual from the scene so that the scene does not become more volatile in the best manner, faced with the circumstances in the best manner possible. And I suggest to you the way he did it is the best manner possible with the least amount of force. Thank you, Your Honor. Thank you both.